# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | | |
|---|---|---|
| JUDITH A. WINFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CAUSE NO.: 2:08-CV-237-PRC |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
## OPINION AND ORDER FOR ENTRY OF FINAL JUDGMENT

This is an action by Plaintiff Judith A. Winfield against Defendant United States of America brought under the Federal Tort Claims Act, 28 U.S.C. § 2671, as a result of a fall by Ms. Winfield on a sidewalk on the premises of the Hammond Federal Courthouse. By stipulation of the parties, trial on the issues of liability and damages was bifurcated, and this matter came before the Court for a bench trial solely on the issue of liability on November 12, 2009. Ms. Winfield appeared in person and by counsel, Attorney Robert Vann. The United States of America appeared by counsel Joseph S. Reid, Assistant United States Attorney, and by Richard Falzone, Lead Property Manager for Northwest Indiana for the United States General Services Administration. Ms. Winfield presented evidence and rested. The United States presented evidence and rested.

After hearing all of the evidence, taking into account the credibility of the witnesses, and considering the parties' pleadings and the exhibits admitted into evidence, the Court hereby makes its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) and orders entry of final judgment.

## PROCEDURAL BACKGROUND

On August 25, 2008, Ms. Winfield filed a Complaint against the United States General Services Administration ("GSA") and the United States of America, seeking money damages for the injuries she allegedly suffered as a result of her fall on December 27, 2005. She alleges that the United States was negligent in "that [it] failed to use reasonable care in providing signs, directions, or other markers . . . to indicate the location of an uneven sidewalk which was elevated higher than the other portion, and failed to have employees present to notify and/or demonstrate the location of the uneven sidewalk . . . ." Pl. Cmplt., ¶ V. On October 28, 2008, both Defendants filed an Answer, denying the allegations of the Complaint, and on October 31, 2008, Defendant GSA was dismissed pursuant to the Federal Tort Claims Act. At trial, the parties stipulated that the Hammond Federal Building is owned by the United States and managed by GSA, that the claim was timely filed, and that venue is proper. The Court has subject matter jurisdiction pursuant 28 U.S.C. § 1346(b).

The parties filed written notices of consent for the Magistrate Judge to conduct any and all proceedings including trial. Accordingly, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## STANDARD OF PROOF

This matter being a civil case, the Plaintiff Ms. Winfield has the burden to prove her claim, alleged in her Complaint, by a preponderance of the evidence. The Defendant the United States has the burden to prove its affirmative defenses by a preponderance of the evidence.

**FINDINGS OF FACT**

1. The findings of fact herein are based upon the trial evidence. Where factual conflicts in the evidence exist, the findings herein are the facts the Court has determined to be more probably true than not true after resolving the factual conflicts.

2. On December 27, 2005, at approximately 12:15 p.m., Ms. Winfield came to the Hammond Federal Building to attend a bankruptcy hearing. Ms. Winfield parked in the public visitors parking lot to the east of the building.

3. She then walked toward the front entrance of the building using the southerly sidewalk. She was carrying a purse and a portfolio containing a tablet of paper and envelopes for the bankruptcy hearing, she was wearing a trench coat, and her shoes were flat black loafers.

4. The sidewalk was free of debris and dry. The weather was warm and sunny. Mr. Falzone testified that the sidewalk was 192.8 feet long and was 78 inches wide with a slope of 4.84 percent.

5. As she was walking up the incline of the sidewalk, Ms. Winfield was looking forward with her attention focused on the entry door of the building, rather than looking at the ground at her feet. She said that the sidewalk looked like a normal sidewalk and that there was no warning, so she was not looking closely at the sidewalk.

6. As she reached the upper portion of the sidewalk past the black iron benches, the toe of Ms. Winfield's shoe caught "something," she stumbled, she could not stop herself, and she fell to the ground on her hands and knees.

7. As a result of the fall, the palms of her hands were scratched, she skinned and scratched her knees, which initially felt like they were burning, and she tore her stockings at the knee area. Her ankle did not immediately hurt. Two gentlemen who worked at the building, identified as Greg

Mucha and Casimir Ruzyicki, promptly came to assist her. She declined medical treatment at that time.

8. Ms. Winfield attended her bankruptcy proceeding, after which she went to the emergency room at Southlake Methodist Hospital. Her cuts were cleaned, and she was told that the xray of her ankle was negative. Later that evening, however, she received a call at home from the hospital and learned that her left ankle was fractured.

9. Ms. Winfield testified that the sections of sidewalk concrete were not level at the location in the southerly sidewalk where she fell. She testified that the difference in elevation from the first slab up to the second slab was 3/4 of an inch to one inch, but she did not measure the difference. Mr. Falzone, who inspected the area on the day of the fall, testified that the elevation was 1/8 to 3/16 of an inch based on his recollection. He referred to the elevation as a "slight bump." He conceded at trial that a 3/16 inch elevation "could" be a trip hazard.

10. The day after the fall, Ms. Winfield and a friend returned to the location where she fell, and her friend took photographs of the sidewalk. At that time, Ms. Winfield observed that the appearance of the place where she fell had changed because some material had been placed between the slabs and orange cones were placed at that location.

11. Photographic evidence and testimony demonstrate that any elevation between the slabs was in the northern quarter of the width of the sidewalk at that location. In her deposition on February 26, 2009, Ms. Winfield testified that she was walking in the middle of the sidewalk.

12. Ms. Winfield testified that one of the two employees who assisted her immediately following the fall stated, "That would cause a problem we got to get that fixed." Private security officer Greg Mucha denied making the statement. Court security officer Casimir Ruzycki testified at trial that he did not recall making the statement and that he did not even recall the incident.

4

13. Approximately three months after she fell at the Hammond Federal Building, Ms. Winfield was hit by gunfire during a robbery while driving her vehicle in Gary, Indiana. As a result of the gunshot wounds, she was in the intensive care unit and was hospitalized from April 6, 2006, through May 8, 2006. She testified that her memory now is not as good as a result of the trauma of the shooting.

14. Mr. Falzone is the Lead Property Manager for Northwest Indiana, and his office is located at the Hammond Federal Building. Managing safety on the property is one of his responsibilities. He testified that the premises are governed by the Uniform Federal Accessibility Standards ("UFAS"), which he testified are more restrictive than the standards set forth in the Americans with Disabilities Act.[1] He testified that whether leveling of a sidewalk is required under UFAS depends on the extent of change in elevation.

15. Mr. Falzone testified that daily and hourly, he and other building staff inspect the premises for safety hazards, including the sidewalks. These individuals include three staff in his office; building engineers; operation and maintenance contractors, including eleven to sixteen custodians who have included in their duties inspection of the exterior and interior of the property;

---

[1] At trial, Plaintiff questioned Mr. Falzone regarding the requirements for changes in the level of ground surfaces set forth in the Americans with Disabilities Act. However, facilities that are federally funded must comply with the Architectural Barriers Act ("ABA"). *See* Federally Funded Facilities, http://www.access-board.gov/ufas (visited Nov. 19, 2009). In compliance with the ABA, the United States General Services Administration has adopted the "ABA Accessibility Standard for Federal Facilities," which became effective on May 8, 2006, and replaced the Uniform Federal Accessibility Standards ("UFAS"). *See* ABA Accessibility Standard for Federal Facilities, http://www.access-board.gov/ada-aba/aba-standards-gsa.cfm (visited Nov. 19, 2009). Therefore, at the time of Ms. Winfield's fall, the maintenance of the Hammond Federal Building was governed by the UFAS, which provides:
> Changes in level up to 1/4 in (6 mm) may be vertical and without edge treatment (see Fig. 7(c)). Changes in level between 1/4 in and 1/2 in (6 mm and 13 mm) shall be beveled with a slope no greater than 1:2 (see Fig. 7(d)). Changes in level greater than 1/2 in (13 mm) shall be accomplished by means of a ramp that complies with 4.7 or 4.8.

Uniform Federal Accessibility Standards § 4.5.2, http://www.access-board.gov/ufas/ufas-html/ufas.htm (visited Nov. 19, 2009). Notably, Part 303 of the ABA Accessibility Standard sets forth the same requirements as § 4.5.2 of the UFAS. *See* ABA Accessibility Standard for Federal Facilities, Chapter 3, § 303, http://www.access-board.gov/ada-aba/aba-standards-gsa.cfm (visited Nov. 19, 2009).

federal protective service contractors; and court security officers. All of these individuals carry two-way wireless radios.

16. Mr. Falzone testified that if there had been a 3/4-inch change in elevation between the slabs of sidewalk concrete, many people on staff would have observed the condition and reported it. He also testified that someone walking at that location would have seen the change in elevation.

17. There were forms available throughout the building on which all employees could make requests or report hazardous conditions.

18. Mr. Falzone testified that no one has ever before reported unevenness in the southerly sidewalk.

19. Regarding possible hazards on the premises, Mr. Falzone testified that "things don't go unnoticed, unseen, unreported."

20. Greg Mucha has worked as a contract security officer at the courthouse for eight years, working Monday through Friday from 8 a.m. to 4 p.m. For ten to twelve hours each work day, he walks the perimeter of the premises for the specific purpose of looking for hazards or other problems. The area of his patrol includes the southerly sidewalk leading from the public parking area to the building.

21. Mr. Mucha testified that he was the first person to come up to Ms. Winfield and offer her assistance after she fell. He did not see any bruises, scrapes, or cuts and testified that "she appeared fine." He testified that she refused medical assistance.

22. Mr. Mucha testified that he saw a "little uprising" of one of the sections of sidewalk. He testified that it was an elevation of 1/8 inch, but he did not measure it. He testified that the elevation was only at a corner and not across the entire width of the sidewalk.

23. The same day, on December 27, 2005, Mr. Falzone directed someone to place NP1 urethane exterior sealant across the northeasterly sixteen to eighteen inches of the crack between the two slabs of sidewalk.

## CONCLUSIONS OF LAW

The exclusive remedy for Ms. Winfield's negligence claim against the United States is governed by the Federal Tort Claims Act ("FTCA"). *See* 28 U.S.C. § 2679(b)(1). Under the FTCA, the United States may be held civilly liable for personal injury caused by the negligent or wrongful act or omission of an employee acting within the scope of employment "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Because the FTCA incorporates the law of the state in which the tort was committed, Ms. Winfield's claim is governed by Indiana law. *See* 28 U.S.C. § 1346(b)(1).

Under Indiana law, a plaintiff must prove the three elements of a negligence suit: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty by the defendant, and (3) an injury to the plaintiff as a proximate result of the breach. *Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind. 2007). In a premises liability case, the "nature and extent of a landowner's duty to persons coming on the property is defined by the visitor's status as an invitee, a licensee, or a trespasser." *Harradon v. Schlamadinger*, 913 N.E.2d 297, 300 (Ind. Ct. App. 2009). In this case, Ms. Winfield was a public invitee as she was on the premises of the federal courthouse for the purpose of her bankruptcy hearing and, thus, is considered an invitee. *See Burrell v. Meads*, 469 N.E.2d 637, 642 (Ind. 1991) (adopting the definition of "invitee" from the Restatement (Second) of Torts § 332 and establishing three types of invitees: public invitee, business visitor, or social guest).

The duty of the landowner to an invitee is to exercise reasonable care for the invitee's protection while she is on the premises. *Harradon*, 913 N.E.2d at 299-301. However, a "landowner

7

is not absolutely liable for, or an insurer of, the invitee's safety." *Cergnul v. Heritage Inn of Indiana, Inc.*, 785 N.E.2d 328, 331 (Ind. Ct. of App. 2003). Indiana has adopted the expression of the landowner's duty to an invitee as set forth in the Restatement (Second) of Torts:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land, but only if, he
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
> (c) fails to exercise reasonable care to protect them against the danger.

*Harradon*, 913 N.E.2d at 301 (quoting *Burrell*, 569 N.E.2d at 639-40 (quoting Restatement (Second) of Torts § 343 (1965))). All three conditions set forth in § 343 must be met for liability to attach. *Id.*

In this case, Ms. Winfield did not meet her burden at trial of proving that the United States knew of or by the exercise of reasonable care would have discovered the change in elevation between the two slabs of sidewalk where Ms. Winfield fell. First, the evidence at trial establishes that the GSA staff was not aware of the condition of the sidewalk; GSA did not receive a report of the condition either by any of the numerous individuals charged with monitoring the premises for hazardous conditions or by any visitor to the property.

Second, GSA exercised reasonable care in the maintenance and surveillance of the southerly sidewalk yet did not discover the change in elevation between the slabs. Daily and hourly, the premises were inspected for safety hazards by the lead property manager, three other individuals in his office, building engineers, operation and maintenance contractors (including eleven to sixteen custodians who have included in their duties inspection of the exterior and interior of the property), federal protective service contractors, and court security officers. All of these individuals carried two-way wireless radios to communicate, among other things, such conditions. The surveillance

of the property for hazardous conditions was a primary duty of those employees, and the discovery of such a condition was to be promptly reported and addressed. GSA made forms available throughout the building on which all employees could make requests or report hazardous conditions, and no one reported a condition at that location in the sidewalk. The undisputed testimony is that, if there had been a 3/4-inch change in elevation between the slabs of sidewalk concrete as alleged by Ms. Winfield, many people on staff would have observed the condition and would have reported it. Mr. Falzone, the Lead Property Manager, testified that "things don't go unnoticed, unseen, unreported." Accordingly, because there was no failure of reasonable care on the part of the United States, the United States did not breach its duty of care to Ms. Winfield as an invitee, and Ms. Winfield's negligence claim fails.

Under Indiana's Comparative Fault Act, in an "action based on fault that is brought against . . . one (1) defendant . . . [,] the claimant is barred from recovery if the claimant's contributory fault is greater than the fault of all persons whose fault proximately contributed to the claimant's damages." Ind. Code § 34-51-2-6. However, if there is no negligence, there is no fault, and apportionment under the Comparative Fault Act is not possible. *See Crist v. K-Mart Corp.*, 653 N.E.2d 140 (Ind. Ct. App. 1995). Although the Court has found that the United States was not negligent and thus, was not at fault, for the sake of thoroughness, the Court finds that the fault of Ms. Winfield was greater than that of the United States, if any could be established. Ms. Winfield testified that, as she was ascending the sidewalk from the parking lot to the front of the building, she was looking forward with her attention focused on the exterior door of the building at the top of the hill. She testified that she was not looking at the ground at her feet and that she was not looking closely at the sidewalk. When walking, people exercising reasonable care frequently visually check the surface conditions where they are walking. Ms. Winfield was ascending the sidewalk from a

lower point on the incline than the place at which she fell, which was almost at the top of the incline, and for a sufficient distance from the beginning of the sidewalk to the point of the fall such that, if the difference in elevation between the sidewalk slabs was significant enough to cause her to stumble and fall, a person exercising ordinary care would have noticed the condition and avoided it. Because Ms. Winfield's attention was focused on the building and not the sidewalk, she did not observe the condition and did not avoid it.

## CONCLUSION

**IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED** that Plaintiff Judith A. Winfield take nothing by her Complaint and judgment is entered in favor of Defendant United States of America. The Clerk of this Court is **DIRECTED** to enter final judgment accordingly.

So ORDERED this 23rd day of November, 2009.

s/ Paul R. Cherry  
MAGISTRATE JUDGE PAUL R. CHERRY  
UNITED STATES DISTRICT COURT

cc: All counsel of record